UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| ROBERT JOHNSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:18-cv-01317-JRS-TAB |
| | ) | |
| STATE OF INDIANA, INDIANA DEPART- | ) | |
| MENT OF HOMELAND SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## Order on Motion for Summary Judgment

Plaintiff Robert Johnson brought this action against Defendant State of Indiana, Indiana Department of Homeland Security under Title VII of the Civil Rights Act of 1964 ("Title VII") 42 U.S.C. § 2000e *et seq*. Johnson alleges that Defendant terminated his employment in retaliation for his report of sexual harassment of three women by a coworker, David Smith. Defendant moves for summary judgment. (ECF No. 41) For the reasons that follow, the Court finds that summary judgment should be **granted**.

## I.  Background

Johnson began his employment with the Indiana Department of Homeland Security ("IDHS") as Assistant State Fire Marshal in September 2013. (Greeson Dep. 7:8-10, ECF No. 42-1 at 7.) In that position, he was second in command of the Division of Fire and Building Safety, a section of IDHS. (Kane Dep. 8:17-25, ECF No. 42-2 at 7.) Johnson was hired by and reported directly to the State Fire Marshal James

Greeson.  (Kane Dep., 10:13-17, ECF No. 42-2 at 9.)

Johnson testified that he and Greeson had different management styles—Johnson was more hands-off, whereas Greeson was more hands-on.  (Johnson Dep. 33:19-25, ECF No. 42-3 at 18.)  Johnson believed that this difference in management styles caused a "disconnect."  (Johnson Dep. 40-41:23-5, ECF No. 42-3 at 25-26.)  He spoke with Greeson a few times about this because Johnson could see in Greeson's actions "that [Greeson] didn't like the way [Johnson] was doing things or the way [he] did [his] management style."  (Johnson Dep. 35:1-15, ECF No. 42-3 at 20.)  Johnson thought that Greeson had "some professional jealousy" toward Johnson.  (Johnson Dep. 37-38:8-1, ECF No. 42-3 at 22-23.)  Johnson explained that some employees would take their problems to Johnson rather than Greeson, and when this occurred, Greeson focused on the fact that the person went to Johnson as opposed to the problem itself.  (Johnson Dep. 37-38:8- 15, ECF No. 42-3 at 22-23.)

Greeson testified that at times, he had "an issue with the relationship between . . . Johnson and [then] Director [David] Kane."  (Greeson Dep. 53:10-12, ECF No. 42-1 at 49.)  Greeson added that "Director Kane would find out things before [he] would . . . ."  (Greeson Dep. 53:12-14, ECF No. 42-1 at 49.)  Former Director Kane said he was "mindful that the fire marshal was sometimes displeased that [Johnson] was talking with [Kane]."  (Kane Dep. 65:20-22, ECF No. 42-2 at 40.)  On at least two occasions it "was clear" to Director Kane "that there was conflict between the marshal and the assistant marshal to the point that [Kane] thought it needed intervention to try and make it a better working relationship."  (Kane Dep. 63:19-25, ECF No. 42-2 at 38.)

While employed with IDHS, Johnson was given annual performance appraisals. (Johnson Dep. 30:9-11, ECF No. 42-3 at 15.)  In 2014 and 2015, he was rated as "met" or "exceeded expectations" in all categories of the appraisals.  (Johnson Dep. 30:12-14, ECF No. 42-3 at 15.)  For his 2016 appraisal, however, he was rated "does not meet" expectations in two out of seven [c]ompetencies—teamwork and problem solving/decision making.  (ECF No. 42-6 at 2.)  More specifically, under Teamwork, the appraisal stated that Johnson "needs to improve on managing staff"; he "tends to be hands off when supervising staff, which led to stressful situations causing one employee to leave employment"; and at times, "Johnson makes comments without thinking that are offensive to staff." (ECF No. 42-6 at 2.)  Marshal Greeson testified that in November 2016  Johnson once commented to him and his assistant that the problem in the fiscal staff was "it's just a bunch of damn women."  (Greeson Dep. 36, ECF No. 45-1 at 37.)  The appraisal stated under "Problem Solving/Decision Making" that "[t]his is an area where Mr. Johnson needs to mature.  He believes the work place is to have fun and tends to bring difficult or controversial decisions to the fire marshal instead of handling them.  There are times when his initial decision-making starts with the Executive Director and not with lower level supervisors."  (ECF No. 42-6 at 2.)

The appraisal stated that the "[f]ailure to meet expectations for any Competency may result in employee being placed on a Work Improvement Plan or separation." (ECF No. 42-6 at 3.)  Nonetheless, Johnson's Overall Performance Rating was "Meets Expectations" and no Work Improvement Plan was generated as a result of his 2016

appraisal. (ECF No. 42-6 at 3–4.) The appraisal was signed by Marshal Greeson as the Evaluator, signed by an unidentified Reviewer with a date of "12-27-16," and signed by the Appointing Authority with a date of "2/2/17." (ECF No. 42-6 at 4.) Johnson did not sign the appraisal and he contends that he never received the appraisal because his position was eliminated. (Johnson Dep. 167:3-8, 192:16-20, ECF No. 42-3 at 111, 131.) He testified that he "usually" reviewed his performance appraisals with Greeson "in March" of each year. (ECF No. 42-3 at 131.)

In the fall of 2016, IDHS's Chief Financial Officer ("CFO") left IDHS employment, leaving the finance department without anyone in charge. (Kane Dep. 44:7-16, ECF No. 42-2 at 28.) Instead of hiring a new CFO, Director Kane selected Johnson to serve as Acting Chief Administrative Officer ("CAO"). (Kane Dep. 13:11-24, ECF No. 42-2 at 12; Johnson Dep. 68:5-19, ECF No. 42-3 at 33.) Johnson began as Acting CAO on September 4, 2016 (Johnson Dep. 38-39:21-1, ECF No. 42-3 at 23-24), and was to fill the position "for 90 days or until the [CFO] position [was] filled." (ECF No. 42-7; *see also* Johnson Dep. 68-69:20-5; 70:8-12, ECF No. 42-3 at 33-34, 35, 40.) Director Kane did not fill the CFO position permanently because he was resigning as director of IDHS, and he decided the incoming director should fill the position. (Johnson Dep. 75:8-14, ECF No. 42-3 at 40; Kane Dep. 20:6-20, ECF No. 42-2 at 19.)

When Johnson became Acting CAO, Marshal Greeson took over all of the duties of the Assistant Fire Marshal. (Greeson Dep. 11:9-23, ECF No. 42-1 at 11; Johnson 89:8-11, ECF No. 42-3 at 47.) Marshal Greeson testified that thereafter, at the end of November 2016, he decided to eliminate the Assistant Fire Marshal position.

(Greeson Dep. 35:4-9, ECF No. 42- 1 at 31.) He identified several reasons for this decision, including: (1) the division's "budget was suffering," "we were having a difficult time hiring people in certain areas of our division," and he "was looking for ways to reduce costs and save money . . . [so] as to hire other . . . employees," (Greeson Dep. 33-34:23-10, ECF No. 42-1 at 29-30); (2) after assuming the Assistant Fire Marshal's duties, Greeson felt the Division of Fire and Building Safety was "working along well" and was not "bogged down," (Greeson Dep. 33-34:23-4, ECF No. 42-1 at 29-30); (3) Johnson's absence caused Greeson to learn that Johnson "tended to socialize," rather than "manage and direct," (Greeson Dep. 50:13-19, ECF No. 42-1 at 46); and (4) Greeson decided that he could eliminate the Assistant Fire Marshal position to potentially hire support staff for other areas in the division (Greeson Dep. 34:11-14, ECF No. 42-1 at 30). Director Kane did not recall whether Marshal Greeson ever informed him that he wanted to eliminate the Assistant Fire Marshal position. (Kane Dep. 19, ECF No. 45-3.)

On December 28, 2016, three female employees, Amber Kent, Taylor Workman and Jennifer Damadarius, approached Johnson about their supervisor, David Smith, and reported that Smith was sexually harassing them. (Johnson Dep. 96:10-24, 97:2-11 ECF No. 42-3 at 54–55.) Because Smith reported directly to Marshal Greeson, Johnson requested Greeson meet with Johnson and the three employees. (Johnson Dep. 101-102:18-9, ECF No. 42-3 at 59-60.) The employees told Marshal Greeson that Smith had been acting inappropriately in terms of his language and the manner in which he conducted himself and that they felt uncomfortable. (Johnson Dep. 102:20-

25, ECF No. 42-3 at 60; Greeson Dep. 13-14:18-1, ECF No. 42-1 at 13-14.) Marshal Greeson said he would "take care of it." (Johnson Dep. 103:1-9, ECF No. 42-3 at 61.) Immediately thereafter, Marshal Greeson called Smith into his office and advised him that he had met with three employees who had complaints about Smith's language and conduct, the behavior had to stop, and if Marshal Greeson heard "another word," Smith would be fired. (Greeson Dep. 14:8-23, ECF No. 42-1 at 14.) Marshal Greeson went back to one of the employees to let her know he had talked with Smith. (Greeson Dep. 14–15, ECF No. 42-1 at 14–15.)

On January 5, 2017, Johnson talked to Director Kane about the allegations against Smith. (Johnson Dep. 104-105:12-4, ECF No. 42-3 at 62-63; Kane Dep. 47:2-10, ECF No. 42-2 at 31.) Director Kane instructed Johnson to notify human resources, and Johnson spoke with Maria Limon in human resources. (Johnson Dep. 104-106, ECF No. 42-3 at 62-64; Kane Dep. 47:2-10, ECF No. 42-2 at 31.) Director Kane testified that he would not have known about the allegations against Smith if Johnson had not reported them. (Kane Dep. 55–56, ECF No. 45-3.) The State Personnel Department investigated the allegations, which concluded with Smith's termination in mid-February 2017. (Greeson Dep. 25:19-24, 26:7-12, ECF No. 42-1 at 21, 22.) Johnson did not speak with anyone at IDHS about the agency's handling of the investigation, and he did not see or hear anything to suggest that the three complaining employees were treated differently after reporting the harassment. (Johnson Dep. 109:9-24, ECF No. 42-3 at 67.) Johnson did not speak with Marshal Greeson again about the allegations or the investigation. (Johnson Dep. 107:6-7, ECF No. 42-

3 at 65.) Johnson admits that after he reported the allegations to human resources, IDHS appropriately handled the investigation. (Johnson Dep. 108-109:17-1, ECF No. 42-3 at 66-67.) Johnson thought that "Marshal Greeson dropped the ball or didn't act on" the sexual harassment allegations. (Johnson Dep. 109:1-3, ECF No. 42-3 at 67.) Yet, he testified that he has "no idea" what Marshal Greeson did with the report of sexual harassment. (Johnson Dep. 104:5-11, 109:4-8, ECF No. 42-3 at 62, 67.)

On January 9, 2017, Bryan Langley became director of IDHS. (Langley Dep. 5:14-20, ECF No. 42-8 at 6.) A hiring freeze had left IDHS with "a multitude of vacancies on paper," but no funding to fill the positions. (Langley Dep. 8-9:24-3, ECF No. 42-8 at 9-10.) The agency worked to fill critical positions using funding from vacant positions. (Langley Dep. 12-13:12-5, ECF No. 42-8 at 13-14.) On or about February 22, 2017, Director Langley hired Adam Theimann as CFO. (Langley Dep. 24:16-21, ECF No. 42-8 at 22.)

Sometime in early February 2017, after Director Langley had announced the hiring of Theimann, Marshal Greeson advised human resource representative Jordan Bolden and Director Langley that he did not want Johnson to return as Assistant Fire Marshal. (Greeson Dep. 43:8-17, 45:2-12, ECF No. 42-1 at 39, 41; *see also* Langley Dep. 50:22-25, ECF No. 42-8 at 36; Greeson Dep. Ex. 25, ECF No. 45-7.) Although Director Langley said that he "really didn't need" the position, in the end he deferred to Marshal Greeson's decision whether to eliminate the position. (Langley Dep. 28:20-25, 29:9-14, ECF No. 42-8 at 25, 26.) The decisions to eliminate the position and remove Johnson were Greeson's decisions. (*Id.*)

On March 1, 2017, Johnson was called into a meeting with Marshal Greeson and Bolden. (Johnson Dep. 124:2-8, 126:10-16, ECF No. 42-3 at 82, 84.) Bolden informed Johnson that "Director Langley was moving Homeland Security in a different direction and that the funding for [Johnson's] position, assistant fire marshal, was being repurposed throughout the agency. Therefore, [the agency was] doing away with [his] job." (Johnson Dep. 126-127:19-4, ECF No. 42-3 at 84-85.) Marshal Greeson did not speak during the meeting, except to say that he had "lost two days sleep over" it. (Johnson Dep. 127, ECF No. 42-3 at 85.) After that meeting, Johnson had no further discussions with Marshal Greeson about his discharge. (Johnson Dep. 136:8-10, ECF No. 42-3 at 94.) Nor did Johnson discuss his discharge with Director Langley or anyone else at the agency. (Johnson Dep. 136:3-5, ECF No. 42-3 at 94.) At the time of Johnson's discharge, Kent, Workman, and Damadarius were still employed with IDHS. (Johnson Dep. 109-110:25-9, ECF No. 42-3 at 67-68.)

A March 1, 2017 email exchange between Bolden and Marshal Greeson set out the reasoning for Johnson's termination: "The position needs to be repurposed—whether in the fire division or not. . . . [T]his position has just not turned out to be as productive/useful as IDHS initially thought it would be," (ECF No. 42-9 at 1); "[h]is absence in the fire division over the last few months made it obvious to management that the position isn't necessary. We are going to repurpose those funds," (*id.*); "[f]ailure to produce any tangible work product," (*id.*); "[t]ransition into CAO exposed lack of

leadership and management skills, other competencies in critical areas," (*id.*); and "[m]ultiple employee relation issues exposed . . . ." (ECF No. 42-9 at 2.)[1]

In a September 2017 email from Bolden to employees with the State Personnel Department regarding the decision to terminate Johnson's position, Bolden wrote that in early February after Director Langley had announced he would be hiring Thiemann as his new CFO, Marshal Greeson advised her that he did not want Johnson to return to his previous role as Assistant Fire Marshal. (ECF No. 42-10.) The email cited the reasons Greeson had given Bolden, including Johnson's failure to assist with managing staff appropriately and an offensive comment by Johnson about women. (*Id.*)

In explaining the decision that Johnson would not return to the Assistant Fire Marshal position, Greeson testified that when Johnson became interim CAO, Greeson assumed all the duties he had had before, and the division was working well, was not "bogged down," and was not having any issues in terms of responsibilities. (Greeson Dep. 33–34, ECF No. 42-1 at 29–30.) At the same time, however, the division had serious budget issues and was "having a difficult time hiring people in certain areas," and the Marshal was looking for ways to reduce costs and save money as far as to hire other individuals, employees." (Greeson Dep. 34, ECF No. 42-1 at 30.) Therefore, Greeson decided that he could eliminate the Assistant First Marshal position and potentially hire support staff for a few other areas within the division. (*Id.*) And he

---

[1] Johnson's brief asserts that Greeson was unable to identify any specific employee relation issues. (ECF No. 44 at 6.) But the cited deposition testimony does not supply factual support for this assertion (Greeson Dep. 70, ECF No. 45-1 at 71), so the assertion is disregarded.

testified that he was, in fact, able to hire other staff—an individual for elevators, one in boilers, and an additional fire investigator—positions that had not been funded before. (*Id.*)

## II. Summary Judgment Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute as to a material fact is genuine when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When reviewing a motion for summary judgment, a court must view all facts and draw all reasonable inferences in favor of the non-moving party. *Id.* at 255. A court may not draw "inferences that are supported only by speculation or conjecture." *Argyropoulos v. City of Alton,* 539 F.3d 724, 732 (7th Cir. 2008) (citation and internal quotation marks omitted).

## III. Discussion

Plaintiff Johnson claims that Defendant IDHS terminated his employment because he reported allegations of sexual harassment of three female coworkers by their supervisor Smith. Johnson maintains that Marshal Greeson began a campaign to remove Johnson from IDHS following Johnson's report of sexual harassment against Greeson's friend, Smith. IDHS responds that it dismissed Johnson for a number of reasons: his "professional conflict" with his immediate and only superior Marshal Greeson; Johnson's absence from the Division of Fire and Building Safety revealed that his position was no longer needed; and Greeson decided to eliminate Johnson's

position in hopes of repurposing funds from Johnson's position to hire additional support staff.

Title VII prohibits employers from retaliating against employees for complaining about discrimination, including sexual harassment. 42 U.S.C. § 20003-3(a). In deciding "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action," courts consider all the evidence "as a whole." *Ortiz v. Werner Enters., Inc.,* 834 F.3d 760, 765 (7th Cir. 2016). However, a plaintiff may still attempt to prove an employment discrimination or retaliation claim under the "direct" method or "indirect," burden-shifting method of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), or both, *Ortiz*, 834 F.3d at 764–66. Here, although IDHS makes arguments pertaining to both methods, Johnson relies only on the direct method. Under the direct method, a plaintiff must show that: (1) he engaged in a statutorily protected activity; (2) his employer took a materially adverse action against him; and (3) there was a causal link between the two. *Mollett v. City of Greenfield*, 926 F.3d 894, 896 (7th Cir. 2019).

Title VII retaliation claims require proof that a retaliatory motive was the but-for cause, not merely a motivating factor, for the employer's action. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 339 (2013); *Mollett*, 926 F.3d at 897. This means that "the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Nassar*, 570 U.S. at 360. Thus, on summary judgment the issue is whether "the record contain[s] sufficient evidence to

permit a reasonable fact finder to conclude that retaliatory motive caused the discharge." *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016) (citing *Ortiz,* 834 F.3d at 765).

For purposes of summary judgment, IDHS does not dispute that Johnson engaged in a protected activity when he reported allegations of sexual harassment by Smith or that his dismissal was an adverse action. Indeed, Johnson's evidence is sufficient to allow a finding in his favor on the first two elements of his claim. The only issue for the Court's consideration is whether a reasonable jury could find that Johnson's report of sexual harassment caused his discharge. Having considered the evidence as a whole, the Court concludes that no reasonable jury could make such a finding.

Johnson believes he was discharged in retaliation for reporting to human resources the allegations against Smith because Johnson "went over [Marshal Greeson's] head and he didn't like it," and Johnson "got [Marshal Greeson's] friend fired." (Johnson Dep. 29:2-6, ECF No. 42-3 at 87.) Johnson testified that after he reported the allegations to human resources, Marshal Greeson started treating him differently. (*Id.*) Johnson said that Greeson stopped responding to his emails, would not return his phone calls, and was avoiding him "face-to-face." (Johnson Dep. 110-111:23-5, 114:3-8, ECF No. 42-3 at 68-69, 72.) However, Johnson did not talk to Marshal Greeson about this perceived change in treatment. (Johnson Dep. 123:9-11, ECF No. 42-3 at 81.) And Marshal Greeson did not say anything to Johnson that made him think Greeson was upset about the Smith investigation. (Johnson Dep. 179:16-21, ECF No. 42-3 at 123.)

Further, Johnson argues that after his report of the harassment complaints to Director Kane, human resources began an investigation that would not have occurred but for his report to Kane. Johnson claims that Marshal Greeson had not notified human resources or Kane of the allegations against Smith. While there is evidence that Marshal Greeson did not notify Kane about the allegations (Kane says he would not have known of the allegations if Johnson had not brought them to his attention (Kane Dep. 55–56)), there is evidence that Marshal Greeson emailed Limon in human resources about the allegations, albeit not until January 6, 2017, which was the day after Johnson went to Kane. (ECF No. 45-5.) Nonetheless, Johnson admitted that he did not know what Marshal Greeson did with the allegations of harassment. (Johnson Dep. 104:5-11, 109:4-8, ECF No. 42-3 at 62, 67.) Thus, any conclusion that IDHS would not have conducted the investigation into the allegations against Smith is based on speculation, which is insufficient to create a factual issue. *See, e.g., Argyropoulos,* 539 F.3d at 736–37.

Johnson argues that IDHS's investigative report shows that numerous employees were aware of Smith's harassing behavior, but because of Smith's personal relationship with Limon and Marshal Greeson, Smith was never held accountable for his behavior. (Greeson Dep. Ex. 24, ECF No. 45-6.) Johnson adds that "Greeson claims he was entirely unaware of . . . Smith's behavior but it is worth noting that the only two individuals interviewed for the investigation who claimed to have no knowledge of . . . Smith's behavior were Maria Limon and Greeson—the very same people that other employees accused of protecting David Smith from discipline." (Pl.'s Res. Br.

13, ECF No. 44.)  Somewhat ironically, the investigative report further indicates that Johnson stated that he did not personally witness any inappropriate behavior from Smith.  (Greeson Dep. Ex. 24 at 7, ECF No. 45-6.)

In attempting to establish a causal link, Johnson first relies on allegedly suspicious timing.  Johnson's position was eliminated and he was terminated two months after he initially reported the sexual harassment by Smith to Marshal Greeson and then reported the harassment to Director Kane.  "Suspicious timing by itself will rarely support an inference of retaliation, but it may do so '[w]hen an adverse employment action follows on the close heels of protected expression and the plaintiff can show the person who decided to impose the adverse action knew of the protected conduct.'"  *Lord*, 839 F.3d at 564 (quoting *Culver v. Gorman & Co.*, 416 F.3d 540, 546 (7th Cir. 2005)) (three days elapsed between plaintiff's discrimination complaint and her termination).  "For an employer's actions to be on the close heels of an employee's conduct, thus allowing an inference of causation based on timing alone, [the Seventh Circuit] 'typically allow[s] no more than a few days to elapse.'"  *Daza v. Indiana*, 941 F.3d 303, 309 (7th Cir. 2019) (quoting *Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012)) (the protected activity and adverse action must be "very close" in time); *see also Lord*, 839 F.3d at 564 (plaintiff was fired two days after he complained about sexual harassment).

While Marshal Greeson clearly knew about Johnson's protected activity, Johnson's termination did not follow on the close heels of that activity.  The approximate two-month gap between Johnson's protected activity—whether it is his December 28,

2016 report to Marshal Greeson or his January 5, 2017 report to Director Kane and human resources—is too great a temporal gap to permit a reasonable inference of causation based on timing alone. *See, e.g.*, *Kidwell*, 679 F.3d at 967 (concluding that a five-week gap between the protected activity and the adverse employment action "militate[s] against allowing an inference of causation based on suspicious timing"). To the extent that Johnson suggests that the timing should be measured from Smith's termination in mid-February 2017 (*see* Pl.'s Res. Br. 14, ECF No. 44 (noting "Johnson's position . . . was eliminated and he was terminated . . . two (2) weeks after David Smith was terminated")—and Johnson offers no precedent for starting the temporal clock from anything other than the employee's protected activity—under the circumstances of this case discussed below, this two-week passage of time is also too great to permit a reasonable inference of a causal link. *See Baig v. Ind., Dep't of Transp.*, No. 1:15-cv-382-WTL-DML, 2017 WL 1165525, at *5, 6 (S.D. Ind. March 29, 2017) (concluding fifteen days proximity did not establish a causal link where investigation into plaintiff's behavior uncovered numerous complaints about his conduct and treatment of employees). As a result, the timing of Johnson's dismissal alone cannot carry his burden of raising a reasonable inference of a causal link. Thus, Johnson can survive summary judgment only "if there is other evidence that supports the inference of a causal link." *Daza*, 941 F.3d at 309 (quoting *Culver*, 416 F.3d at 546).

The other evidence on which Johnson relies to show a causal link is the alleged "sudden" criticism of his job performance. He claims that immediately after his protected activity, Marshal Greeson changed his assessment of Johnson's performance,

said he did not want to work with Johnson anymore, and said he wanted to eliminate the assistant fire marshal position. (ECF No. 44 at 18.) "[A]n employer's sudden dissatisfaction with an employee's performance after that employee engaged in a protected activity may constitute circumstantial evidence of causation." *Culver*, 416 F.3d at 546 (quotation marks and citation omitted). But Johnson has not presented evidence from which a reasonable jury could find that Marshal Greeson was suddenly dissatisfied with Johnson's performance after his protected activity.

Marshal Greeson testified that he had decided at the end of November 2016 to eliminate the Assistant Fire Marshal position. Johnson argues that Marshal Greeson merely claims he made the decision in November 2016 and there is no independent evidence to support that claim. Johnson asserts that all conversations or written evidence of the decision to terminate him or eliminate the Assistant Fire Marshal position occurred after Marshal Greeson became aware of Johnson's protected activity.

However, Johnson's 2016 appraisal, which reflects several concerns with his performance, was completed and signed by Marshal Greeson as the "Evaluator" and was also signed by a "Reviewer" with a handwritten date of "12-27-16," which is the day *before* Johnson reported the sexual harassment complaints to Greeson. (ECF No. 42-6 at 5.) For example, Johnson was rated "Does Not Meet" expectations in connection with his management of staff, where Marshal Greeson had noted that Johnson "tends to be hands off when supervising staff, which led to stressful situations causing one employee to leave employment." (ECF No. 42-6 at 2.) In fact, Johnson testified that

he and Greeson had different management styles—Johnson was more hands-off, whereas Greeson was more hands-on. (Johnson Dep. 33:19-25, ECF No. 42-3 at 18.) Johnson also testified that he believed that this difference caused a "disconnect" (Johnson Dep. 40-41:23-5, ECF No. 42-3 at 25-26) and he understood that Marshal Greeson did not like Johnson's management style (Johnson Dep. 35:1-15, ECF No. 42-3 at 20). Director Kane acknowledged the conflict between Greeson and Kane. Another area in which Johnson was rated as "Does Not Meet" expectations was in Johnson's Problem Solving/Decision Making, in which Marshal Greeson wrote that Johnson needed "to mature," "believes the work place is to have fun and tends to bring difficult or controversial decisions to the fire marshal instead of handling them himself," and at times starts with the Executive Director rather than lower level supervisors. (ECF No. 42-6 at 2.) Even though Johnson's overall performance was rated "Meets Expectations," his 2016 appraisal, which is dated as "12-27-16," is a piece of independent evidence that Marshal Greeson had criticisms of Johnson's performance before Johnson had engaged in protected activity on December 28, 2016 and January 5, 2017.

There is a dispute over whether Marshal Greeson reviewed Johnson's 2016 appraisal with him or not. Marshal Greeson testified that he did, whereas Johnson testified that he did not. The fact that Johnson did not sign the appraisal supports Johnson's position. But the fact that Johnson did not review his 2016 appraisal with Marshal Greeson does not raise a reasonable inference of a retaliatory motive for Johnson's dismissal, contrary to Johnson's suggestion otherwise. After all, Johnson

testified that he "usually" reviewed his annual performance appraisals with Greeson "in March" of each year (ECF No. 42-3 at 131), and Johnson's employment was terminated on March 1, 2017.

Johnson also argues that the 2016 performance appraisal was the first in which he was found to have any performance problems and is inconsistent with his prior appraisals. While Johnson's 2014 and 2015 appraisals were positive, the Court does not "'merely consider whether a plaintiff's actual job performance was satisfactory'; rather, [it] must also contemplate 'factors such as . . . workplace camaraderie.'" *Abrego v. Wilkie,* 907 F.3d 1004, 1013 (7th Cir. 2018) (quoting *Zayas v. Rockford Mem'l Hosp.*, 740 F.3d 1154, 1158 (7th Cir. 2014)). Johnson ignores the evidence of his professional conflict with Marshal Greeson, a conflict that former Director Kane and Johnson himself recognized. Indeed, former Director Kane testified that on at least two occasions, it was clear to him that the conflict between the Marshal and Assistant Marshal required intervention to try and make it "a better working relationship." (Kane Dep. 63:19-25, ECF No. 42-2 at 38.) Evidence of the professional conflict predated Johnson's protected activity, as did the appraisal, which was informed by Greeson taking over Johnson's duties.

Johnson testified that his 2016 appraisal "is total lies. There's no merit to any of [it]." (Johnson Dep. 173-174:20-2, ECF No. 42-3 at 117-118.) As support, Johnson points to his positive performance appraisals from 2014 and 2015. (Johnson Dep. 174:1-6, 178:4-13, ECF No. 42-3 at 118, 122.) It is not enough for Johnson to simply challenge the correctness or fairness of his performance appraisal, but whether it was

"honestly believed." *Culver*, 416 F.3d at 547. However, Johnson conceded that he "[doesn't] know what [Marshal Greeson] feels or thinks." (Johnson Dep. 174:17-24, ECF No. 42-3 at 118.) For his part, Marshal Greeson testified that his opinion of Johnson's performance changed from 2014 to 2016, starting in 2015 and primarily in 2016. (Greeson Dep. 64-65:19-5, ECF No. 42-1 at 56-57.) Greeson also testified that Johnson had not "matured into" certain areas in the Assistant Fire Marshal position. (Greeson Dep. 35:10-14, ECF No. 42-1 at 31.) Johnson even testified that he could see in Marshal Greeson's actions that Greeson "didn't like the way [Johnson] was doing things or the way [he] did [his] management style." (Johnson Dep. 35:1-15, ECF No. 42-3 at 20.)

Johnson argues that Greeson's view of his performance is inconsistent with former Director Kane's view of his performance. The question is not whether another supervisor disagreed with Marshal Greeson's assessment, but whether Greeson honestly believed in his assessment of the lack of need for an assistant fire marshal. *See, e.g.*, *Argyropoulos,* 539 F.3d at 732 ("[W]e ask only whether the employer's explanation was 'honestly believed.'"). And even former Director Kane acknowledged there were times that Marshal Greeson was displeased with Johnson and there had been conflicts between the two.

Regardless of any performance issues, the unrefuted evidence is that Johnson's absence from the Assistant Fire Marshal position and Marshal Greeson's assumption of the position's duties during his absence caused Marshal Greeson to believe that the position was unnecessary. The unrefuted evidence is that Marshal Greeson

assumed the Assistant Marshal's duties when Johnson was placed in the Acting CAO position; that the division was running well and not bogged down during that time; that Johnson's absence caused Marshal Greeson to conclude that Johnson "tended to socialize," rather than "manage and direct" (Greeson Dep. 50:13-19, ECF No. 42-1 at 46); and that, as a result, Marshal Greeson came to believe the assistant position was unnecessary. In addition, Marshal Greeson was looking to fill other positions in other areas of the division. (Greeson Dep. 34:11-14, ECF No. 42-1 at 30.) Other positions in other areas of the division were filled following Johnson's dismissal, and there is no evidence that the Assistant Fire Marshal position was later filled after Johnson's dismissal.

Johnson argues that the reason given to him for his termination at the March 1 meeting was untrue. At that meeting, Bolden advised Johnson that Director Langley was moving IDHS in a different direction and that funding for the Assistant Fire Marshal position was being repurposed throughout the agency, so his position was being eliminated. (Johnson Dep. 126–27, ECF No. 45-4 at 33.) Johnson contends this was an inaccurate statement because the decision to repurpose the funds from the position was made after Marshal Greeson decided that he did not want Johnson to return to that position. Further, Johnson argues that he was only told that the position was being eliminated and repurposed, not that he had performance problems. (Greeson Dep. 77–78, ECF No. 45-1.) The unrefuted evidence is that Marshal Greeson had decided, based on Johnson's absence from the Assistant Fire Marshal position in late 2016, that the position was not needed and the funds for the position could

be used to fill vacant positions. Johnson can avoid summary judgment by identifying evidence that puts this explanation in doubt. *See Culver*, 416 F.3d at 547–48 (stating that the plaintiff "can avoid summary judgment by pointing to specific facts that place the employer's explanation in doubt"). Even when the evidence is viewed in the light most favorable to Johnson, he has not done so.

First, he contends that Marshal Greeson's view that the Assistant Fire Marshal position was superfluous is inconsistent with former Director Kane's testimony that the Fire and Building Safety Division "was just too big" and some responsibilities should be moved to other divisions. (Kane Dep. 71, ECF No. 45-3 at 72.) Even if this could be seen as undermining the elimination of this particular position, the question is not whether another supervisor disagreed with Marshal Greeson's assessment, but whether Greeson honestly believed in his assessment of the lack of need for an Assistant Fire Marshal. *See, e.g.*, *Argyropoulos,* 539 F.3d at 732 ("[W]e ask only whether the employer's explanation was 'honestly believed.'"). And, while not dispositive here, there is no evidence in the record to suggest that the Assistant Fire Marshal position has been filled since Johnson's dismissal, which supports Marshal Greeson's position that it was superfluous.

Johnson does not believe the agency needed to repurpose funds from the Assistant Fire Marshal position because IDHS already had positions open. (Johnson Dep. 142:14- 23, ECF No. 42-3 at 100.) But Johnson testified that he "[doesn't] know that [other positions] could have been repurposed." (Johnson Dep. 144:16-20, ECF No. 42-3 at 102.) Johnson states that at the time of his dismissal, "IDHS moved other

employees around and only [he] was terminated." (Johnson Dep. 145–46, ECF No. 42-3 at 103–04.) He testified that he could have been placed in Smith's position after Smith was terminated, but Johnson acknowledged he never asked about that position and he had no idea whether the position had been filled. (Johnson Dep. 144–45, ECF No. 42-3 at 102–03.) Johnson believes he could have been moved to an open position, but he never asked about any other position. (Johnson 144-145: 21-13, ECF No. 42-3 at 102-103.) And Johnson could not identify any employee who was moved around or to what position. (Johnson Dep. 145–46, ECF No. 42-3 at 103–04.) Without more evidence, he relies only on speculation, which is not enough to create a factual issue for trial. *See, e.g.*, *Argyropoulos,* 539 F.3d at 732. This argument also ignores the admitted conflict between Johnson and Greeson.

Lastly, Johnson argues that Marshal Greeson provided false information to the new incoming human resources representative Bolden, who did not take time to gather the opinions from anyone other than Marshal Greeson. Yet, Johnson further argues that Greeson was "the sole decision maker in eliminating Johnson's position from IDHS." (Pl.'s Resp. Br. 11, ECF No. 44.) Indeed, the evidence is that the decision to eliminate the Assistant Fire Marshal position and the decision to terminate Johnson's employment rested solely with Marshal Greeson. As such, the cat's paw theory has no bearing on this case. *See, e.g.*, *Robinson v. Perales*, 894 F.3d 818, 832 (7th Cir. 2018) (explaining that the "cat's paw" theory "applies when a biased subordinate who lacks decision-making power uses the formal decision-maker as a dupe in a deliberate scheme to trigger a discriminatory employment action") (citation omitted).

Johnson's absence from the Assistant Fire Marshal position caused Marshal Greeson to determine that the position was unnecessary. New IDHS Director Langley was looking to fill positions where there was a critical need, and IDHS could repurpose funds from the Assistant Fire Marshal position to fill other positions. Therefore, the Assistant Fire Marshal position was eliminated, and Johnson's employment was terminated. Johnson has presented insufficient evidence to raise a reasonable inference that, but for his report of the sexual harassment allegations against Smith, he would not have been dismissed. Accordingly, IDHS is entitled to summary judgment.

## Conclusion

Defendant's motion for summary judgment (ECF No. 41) is **granted**.

**SO ORDERED.**


Date: 12/17/2019

JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana


Distribution to all parties of record via CM/ECF.